

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 10, 2026**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CASE NO. 23-30035-MVL7** |
| **ANIMO SERVICES, LLC,** | § | **(CHAPTER 7)** |
| | § | |
| Debtor. | § | |
| | § | |
| **AREYA HOLDER AURZADA,** | § | |
| **TRUSTEE,** | § | |
| | § | **ADVERSARY NO. 25-03016-MVL** |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **EASTBANC TECHNOLOGIES,** | § | **RELATED TO ECF NO. 35** |
| **LLC,** | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

## I.  INTRODUCTION

Before the Court is the *Motion to Dismiss Trustee's Second Amended Complaint* and *Brief in Support* (collectively, the "**Motion to Dismiss**") filed by Defendant EastBanc Technologies, LLC ("**EastBanc**" or the "**Defendant**") on September 8, 2025 [ECF Nos. 35, 36]. In the Motion, the Defendant seeks to dismiss all of the causes of action alleged by Plaintiff Areya Holder Aurzada—the duly appointed Chapter 7 Trustee (the "**Trustee**" or the "**Plaintiff**")—in the *Trustee's Second Amended Complaint* (the "**Complaint**") filed on July 23, 2025 [ECF No. 34].

In response to the Motion to Dismiss, the Trustee filed an *Objection to Defendant's Motion to Dismiss Trustee's Second Amended Complaint* and *Brief in Response* (collectively, the "**Response**") on September 29, 2025 [ECF Nos. 38, 39]. Finally, the Defendant filed a *Reply in Support of Defendant's Motion to Dismiss Trustee's Second Amended Complaint* (the "**Reply**") on October 31, 2025 [ECF No. 43].

The Court held a hearing on the Motion to Dismiss on November 11, 2025. Counsel for the Trustee and EastBanc appeared. After hearing arguments, the Court took the Motion to Dismiss under advisement. The Court has considered the briefing and arguments of counsel and concludes that the Motion to Dismiss should be GRANTED IN PART and DENIED IN PART. The following constitutes the Court's analysis underlying its ruling.

## II.  JURISDICTION

Bankruptcy subject matter jurisdiction exists to determine this motion pursuant to 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### III.   FACTUAL AND PROCEDURAL BACKGROUND

#### A.  Factual History[1]

This case primarily revolves around the contractual relationship between Animo Services, LLC (the "**Debtor**" or "**Animo**") and EastBanc, and the eventual fallout in connection with a Master Services Agreement (the "**MSA**") was signed by the parties on November 19, 2021. ECF No. 34 at 4. Animo was an affiliate of With Purpose, Inc. ("**WPI**"), and was operating, alongside additional affiliates, under the business name "GloriFi". *Id.*

At bottom, GloriFi was a financial technology startup, founded with the primary goal of developing a financial platform catered towards politically conservative consumers. *Id.* Accordingly, to fully maximize the platform's capabilities and match the aspirations of GloriFi's founder—Toby Neugebauer ("**Mr. Neugebauer**")—GloriFi needed to properly develop and launch an "integrated proprietary software system" that would allow GloriFi to offer various banking services, such as checking and savings accounts, brokerage accounts, and insurance policies, among other items. *Id.* This software system (the "**Tech Stack**") would include "customer-facing components", such as a mobile app, and a website that would launch on or around March 31, 2022. *Id.* To facilitate proper development of the Tech Stack for the eventual launch of GloriFi's app and website, Animo contracted with EastBanc for its software products and services. *Id.*

According to the Complaint, the MSA stated that EastBanc would provide software development services and deliverables pursuant to a series of statements of work (the "**SOWs**"), which would be incorporated into the MSA. *Id.* The first of the SOWs was signed by the parties

---

[1] For purposes of this Order, the factual background is based upon the facts contained in the Complaint, which the Court accepts as true for purposes of the Motion to Dismiss in accordance with established authority.

on November 19, 2021 ("**SOW1**"), wherein EastBanc represented that it would develop a "banking solution" for particular components of GloriFi's app and website, including features such as push notifications, profile and preference settings, account and transaction summaries, and the ability for users to activate their respective debit and credit cards (the "**Banking Software**"). *Id*. at 5. Under SOW1, EastBanc promised to deliver the Banking Software no later than February 28, 2022, with an estimated charge to the Debtor of $1,914,500 for its three months of services during that timeframe. *Id*. at 6.

However, the Trustee alleges that within only four days of the signing of SOW1, the project manager at EastBanc overseeing the Banking Software development began requesting "troubling information" from Animo's Vice President of Product, Ryan Geyer, concerning "fundamental basics" of the project itself. *Id*. EastBanc's communications with Animo signaled that "EastBanc's development team did not even know what they had been hired to build and did not have a plan for delivering the Banking Software within three months." *Id*. at 7.

Between November 2021 and December 2021, EastBanc sent invoices to Animo, totaling $582,385.00, which Animo paid on December 8, 2021. *Id*. Shortly after these payments, however, the Debtor's internal team began having issues with EastBanc's performance and its inability to provide adequate security patches to the GloriFi app's servers, ultimately forcing the Debtor to shut down development of the app and website on December 20, 2021. *Id*. After Animo's team purchased its own cybersecurity installation package and requested that EastBanc install the package to protect the GloriFi servers, EastBanc notified Animo that it did not have the "capacity" to install any further security measures at that time. *Id*. at 8.

Notwithstanding these issues, the relationship between Animo and EastBanc, according to the Trustee, continued for some time. First, on January 5, 2022, the parties signed a second SOW

("**SOW2**"), which provided that EastBanc would build an "API proxy" that would allow the GloriFi website and app to share data with another banking platform called "Savana." *Id*. Second, on January 20, 2022, Animo and EastBanc signed a third SOW ("**SOW3**"), which provided that EastBanc would develop an "onboarding experience" for the website and app (the "**Onboarding Software**"). *Id*. Pursuant to SOW3, EastBanc would deliver the Onboarding Software by March 31, 2022, the intended launch date for GloriFi's website. *Id*. at 9. Finally, on January 27, 2022, the parties signed a fourth SOW ("**SOW4**"), which provided that EastBanc would build a "brokerage app" for GloriFi customers to buy and sell securities (the "**Brokerage Software**"). *Id*. In sum, across all four SOWs, Animo contracted with EastBanc for the development of what the Trustee collectively refers to as the "EastBanc Software." *Id*.

Animo made several invoice payments with respect to the SOWs. First, on January 18, 2022, pursuant to SOW2, the Debtor made three payments to EastBanc totaling $333,160.80 for work related to development of the API. *Id*. at 8. Second, on February 15, 2022, made two payments to EastBanc, totaling $633,772.08, with respect to the work generally being done on the EastBanc Software. *Id*. at 9. Third, Animo made three payments, totaling $137,851.00, on February 24, 2022, with respect to the EastBanc Software. Fourth, on March 4, 2022, Animo made an additional payment to EastBanc, totaling $314,020.80. *Id*. at 10. Finally, Animo made additional payments to EastBanc on April 25, 2022. *Id*.

Despite Animo's payments to EastBanc, the Trustee alleges that EastBanc missed its deadlines with respect to the EastBanc Software under all four SOWs, and that, by the middle of April 2022, after five months, it still had not delivered working versions of GloriFi's app or website. *Id*. Moreover, the Trustee alleges that in May 2022, not only did Animo's internal team reportedly find hundreds of active defects in the EastBanc Software, but EastBanc's internal

development team purportedly no-showed a meeting with Animo during a critical juncture in the development process. *Id*. at 11.

According to the Trustee, by May 2022, the relationship between Animo and EastBanc had begun to completely unravel. On May 17, 2022, Animo's internal team removed the EastBanc Software from GloriFi's infrastructure as a means of providing triage to the "multitude of defects" allegedly created by EastBanc. *Id*. at 12. On June 6, 2022, Animo's internal team removed EastBanc from any outstanding work on GloriFi's app and website, marking the end of the parties' contractual relationship. On July 8, 2022, EastBanc sent Animo a letter demanding an additional $2,179,789.60 in fees related to its work on the EastBanc Software. *Id*. Finally, in late-July 2022, that the parties initiated respective legal actions on or around July 2022, with each party claiming the other had breached the MSA and SOWs. *Id*.

### B.  Procedural History

In the Complaint, the Trustee alleges six causes of action: (1) Avoidance of Fraudulent Transfer pursuant to § 548(a)(1)(B) of the Bankruptcy Code; (2) Avoidance of Fraudulent Transfer pursuant to § 24.005 of the Texas Uniform Fraudulent Transfers Act ("**TUFTA**"); (3) Recovery of Voidable Transfer pursuant to § 550 of the Bankruptcy Code; (4) Disallowance of Claim pursuant to § 502 of the Bankruptcy Code; (5) Breach of Contract; and (6) Pre-Judgment Interest, Attorneys' Fees, and Expenses. ECF No. 34 at 20–25.

Under Count I, the Trustee alleges that Animo transferred $2,606,124.65 to EastBanc between December 10, 2021, and April 25, 2022, in connection with the Defendant's purported work on the Tech Stack. *Id*. at 20. However, the Trustee alleges that not only was EastBanc's work "defective", given the Defendant "never delivered working versions of the [EastBanc Software]", but that Animo was financially vulnerable, woefully undercapitalized, and balance sheet insolvent

during this entire period of time. *Id*. Thus, the transfers of approximately $2.6 million to EastBanc constitute constructive fraudulent transfers pursuant to § 548 of the Bankruptcy Code. Under Count II, the Trustee similarly pleads the above-mentioned transfers and financial vulnerability of the Debtor constitute constructive fraudulent transfers pursuant to § 24.005(a)(2) of TUFTA, made applicable through § 544 of the Bankruptcy Code. *Id*. at 21. Relatedly, the Trustee alleges in Count III of the Complaint that, upon a finding in favor of the Trustee on Counts I and/or II, the Trustee is entitled to recover the $2,606,124.65 from EastBanc. *Id*. at 23.

Under Count IV, the Trustee alleges that, pursuant to § 502(j) of the Bankruptcy Code, the previously-allowed claim—filed by EastBanc on July 11, 2024 (the "**EastBanc Claim**") [Case No. 23-30035, Claim 10-1], objected to by the Trustee on September 12, 2024 (the "**Claim Objection**") [Case No. 23-30035, ECF No. 74], and sustained by the Court on October 18, 2024, in its *Order Sustaining Trustee's Objection to Proof of Claim No. 10-1 by EastBanc Technologies, LLC* (the "**Claim Objection Order**") [Case No. 23-30035, ECF No. 77]—must be reconsidered and disallowed. *Id*. at 24.

Under Count V, the Trustee alleges that: (1) EastBanc "never delivered" the EastBanc Software as it was contractually obligated to do; (2) failed to timely complete the deliverables pursuant to the SOWs; (3) failed to apply a contractually-mandated 25% fees reduction to its services as set forth in the MSA; and (4) Animo suffered harm as a result of EastBanc's numerous breaches of the agreements. *Id*. at 25.

Finally, under Count VI, the Trustee alleges that she is entitled to recover pre-judgment interest and reasonable costs and attorney's fees, pursuant to § 38.001 of the Texas Civil Practice and Remedies Code. *Id*.

In the Motion to Dismiss, EastBanc raises several reasons for why the Court should dismiss the Complaint. First, EastBanc argues that all of the claims should be dismissed under res judicata principles because the Complaint and the Claim Objection Order are "based on the same nucleus of operative facts," and that the Court's Order, which allowed the EastBanc Claim as a general unsecured claim in the amount of $2,151,183.97, was effectively a "final judgment" entitled to preclusive effect with regard to the causes of action the Trustee should or could have brought as part of the Claim Objection. ECF No. 36 at 15–19.[2]

EastBanc argues that that the Complaint is inconsistent with the Claim Objection Order, given that the Court necessarily "determined EastBanc provided valuable services to the Debtor" and the Claim Objection—which was ultimately sustained in favor of the Trustee. *Id*. Accordingly, "[t]he time to assert these claims and raise these arguments was in connection with the [EastBanc Claim] and prior to entry of the [Claim Objection Order], which the Trustee did not appeal." *Id*.

The second argument furthered by EastBanc is that, even if the Court denies the Motion to Dismiss on res judicata grounds, the Trustee has failed to state fraudulent transfer claims under Counts I and II because she has not plausibly alleged that EastBanc did not provide Animo "reasonably equivalent value" in exchange for the amounts transferred to the Defendant. *Id*. at 19–22. Rather, EastBanc contends that the Trustee's claims are built entirely on "hindsight factual allegations that are insufficient to demonstrate less than reasonably equivalent value." *Id*. at 21.

Third, EastBanc argues that Count IV should be dismissed because the Trustee made no attempt to demonstrate "cause" for reconsideration of the EastBanc claim as required under § 502(j) of the Bankruptcy Code. *Id*. at 23. Additionally, EastBanc contends that the Trustee was

---

[2] The Court notes that, in the Motion to Dismiss, EastBanc seeks dismissal under its res judicata argument for Counts I, II, and V, specifically. However, as noted by EastBanc, given that Counts III, IV, and VI are dependent on Counts I and II, EastBanc requests a dismissal of all of the Trustee's causes of action if the Court were to dismiss Counts I, II, and V. ECF No. 36 at 15.

also required to satisfy the requirements of Rule 60(b) of the Federal Rules of Civil Procedure (the "**Rules**"), which permits Courts to "relieve parties from final order for any of six enumerated reasons," and which previous courts, including the Fifth Circuit, have applied in the proof of claim context. *Id*. at 23–24 (citing *In re Colley*, 814 F.2d 1008, 1010 (5th Cir. 1987)).

Finally, EastBanc contends that Count V should be dismissed because the Trustee has failed to state a claim for breach of contract. More specifically, EastBanc argues that the Trustee failed to: (1) provide copies of either the MSA or the SOWs; (2) specify which provisions of the contracts were allegedly breached; (3) describe and quote the pertinent provisions and deadlines allegedly breached under the contracts; (4) failed to describe how Animo performed its obligations under the contracts, as required for a breach of contract claim; and (5) failed to specifically state or describe the alleged harm the Debtor purportedly suffered. *Id*. at 24.

Accompanying its breach of contract argument, EastBanc additionally contends that Count V is insufficient with respect to alleged damages because the MSA contains a Limitation of Liability Clause that, according to EastBanc, effectively bars the breach of contract claim "even if the damages allegation has been well-pleaded." *Id*. at 30.

The Trustee provides several counterarguments in her Response. First, the Trustee argues that she has more than sufficiently pleaded a lack of reasonably equivalent value under Counts I and II. ECF No. 39 at 12–16. At bottom, the Trustee argues that EastBanc was hired to develop code for GloriFi's banking platform within three months and that, after seven months, the code had to be "scrapped" because it was "so defective that starting over from scratch was more efficient." *Id*. Moreover, the Trustee contends that the EastBanc Software was not only unusable at the time of each transfer of funds from Animo to EastBanc, but that the software had been

unusable "all along" as confirmed by Animo's own internal testing of the software's allegedly numerous defects. *Id*. at 16–17.

Likewise, the Trustee notes that, despite EastBanc's argument that the Trustee is attempting to evaluate the transfers in hindsight, "the Debtor could only know whether EastBanc's code worked" when it began testing the GloriFi app in April 2022. *Id*. Accordingly, EastBanc plausibly failed to provide any reasonably equivalent value to Animo because, "from the time of the first transfer to the time of the last transfer," the EastBanc software was worthless to the Debtor in terms of functionality. *Id*.

As to the res judicata effect of the Claim Objection Order, the Trustee points out that the Claim Objection was based solely on the fact that the amount of the EastBanc Claim was not supported by its attachments and that the Claim Objection Order was entered on negative notice without a response by EastBanc, thereby highlighting that the EastBanc Claim was "never litigated or decided on the merits, and the [Claim Objection Order] amounts to a default judgment against EastBanc." *Id*. at 25. Given that the "underlying merits of the relationship" between Animo and EastBanc were never considered as part of the EastBanc Claim and the Claim Objection, the Claim Objection Order effectively amounts to a default order and thus res judicata is inapplicable to the Trustee's claims. *Id*. at 25–26. The Trustee further argues that the Complaint contains sufficient allegations to state a claim under § 502(j) because the Court's discretion to reconsider an allowed or disallowed claim is "virtually plenary" and dependent upon the "equities of the case." *Id*. at 27 (citing *Colley*, 814 F.2d at 1010).

The Trustee's final argument is that she has sufficiently pleaded a breach of contract claim under Count V because the Complaint is replete with allegations pertaining to the various elements for a breach of contract claim. Likewise, EastBanc's attempt to use the Limitation of Liability

Clause, even if it were to be considered at the Motion to Dismiss stage, does not necessarily defeat the specific allegations of harm suffered by the Debtor included in the Complaint. *Id*. at 28–29.

## IV. STANDARD OF REVIEW

### A. Rule 12(b)(6)

Rule 12(b)(6), incorporated by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizes dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded facts as true, and view them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (quoting *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir. 1986)). However, the Court need not "strain to find inferences favorable to the plaintiffs." *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations, which, if accepted as true, state a plausible cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim satisfies the plausibility test 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ, 2021 WL 2546664, at *1 (Bankr. N.D. Tex. June 3, 2022) (Jones, J.). This plausibility requirement sits somewhere between possible and probable, and is satisfied where the plaintiff's pleaded facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678

Although the complaint is not required to provide detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555. However, numerous courts within the Fifth

Circuit have reiterated that because "a complaint must be liberally construed in favor of the

plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely

granted." *Reagor-Dykes*, 2021 WL 2546664 at *2 (citation omitted). In reviewing the motion, the

court looks to the pleadings, alongside any documents attached or incorporated into the complaint

by reference. *See Mirant Corp. v. Southern Co.*, 337 B.R. 107, 115 (N.D. Tex. 2006).

## V.    LEGAL ANALYSIS

The dispositive issues before the Court are: (1) whether res judicata requires dismissal of

the Trustee's causes of action; (2) whether the Trustee has plausibly pleaded "reasonably

equivalent value" under Counts I and II; (3) whether the Trustee has plausibly pleaded "cause" for

reconsideration of the EastBanc Claim under Count IV pursuant to § 502(j) of the Bankruptcy

Code; and (4) whether the Trustee has plausibly pleaded the necessary elements for breach of

contract under Count V. The Court addresses each of the issues in turn.

### A.  *Res Judicata*

"Under res judicata, a final judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have been raised in that action." *Pie Dev.*

*L.L.C. v. Pie Carrier Holdings, Inc.*, 128 F.4th 657, 662 (5th Cir. 2025) (quoting *Allen v. McCurry*,

449 U.S. 90, 94, (1980)) (internal quotations omitted). Res judicata bars an action when four

elements are met:

> (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered
> by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment
> on the merits; and (4) the same claim or cause of action was involved in both actions.

*Id.* at 662. (quoting *Houston Pro. Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir.

2016) (internal quotations omitted). Additionally, courts also consider: (1) whether and to what

extent the claimant had actual or imputed awareness prior to the action of a real potential for the currently asserted claims; and (2) whether the bankruptcy court possessed procedural mechanisms that would have allowed the claimant to assert such claims. *In re Paige*, 610 F.3d 865, 873–74 (5th Cir. 2010).

Evaluation and application of EastBanc's res judicata argument provides additional considerations and, frankly, complications for the Court. Most notably, pursuant to Rule 8, res judicata is an affirmative defense.  *See* Fed. R. Civ. P. 8(c).  The general rule under Fifth Circuit precedent is that "res judicata generally cannot be raised in a motion to dismiss and should instead be pleaded as an affirmative defense." *Pie Development*, 128 F.4th at 661; *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311 (5th Cir. 2020).

Courts have recognized that dismissal pursuant to Rule 12(b)(6) **may** be appropriate in consideration of a res judicata defense "if the res judicata bar is apparent from the complaint and judicially noticed facts and the plaintiff fails to challenge the defendant's failure to plead it as an affirmative defense. *Pie Development,* 128 F.4th at 661. In such a scenario, the complaint must "**reveal beyond doubt**" that a plaintiff can prove "no set of facts" that would overcome such an affirmative defense or otherwise entitled them to relief. *Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.,* 27 F. 4th 313, 320 (5th Cir. 2022) (quoting *Garrett v. Commonwealth Mortg. Corp.*, 938 F.2d 591, 594 (5th Cir. 1991)) (internal quotations omitted) (emphasis added). As expressed by the Fifth Circuit in *Eagle Mountain*, "A claim suffering from this kind of facial deficiency warrants dismissal because it has a 'built-in defense and is essentially self-defeating.'" *Id*. at 320 (quoting *Garrett*, 938 F.2d at 594). Additionally, in making such a determination, courts may take judicial notice of previous judgments, opinions and matters of public record. *Anderson*, 953 F.3d at 314 (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

Application of res judicata in the instant case is further complicated by the fact that the Trustee has made a specific request for reconsideration under § 502(j) of the Bankruptcy Code. Section 502(j) grants the bankruptcy court the power to reconsider a claim that has been allowed or disallowed according to the equities of the case. 11 U.S.C. § 502(j). Similarly, Bankruptcy Rule 3008 grants the bankruptcy court the power to reconsider an order allowing or disallowing a claim "**after notice and a hearing**." Fed. R. Bankr. P. 3008 (emphasis added). Following reconsideration of a claim, the court may "allow or disallow the claim, increase or decrease the amount of a prior allowance, accord the claim a priority different from that originally assigned it, or enter any other appropriate order." Fed. R. Bankr. R. 3008 advisory committee's note to 1983 amendment.

Given that § 502(j) implicitly involves factual determinations in connection with the "cause" provided by the claimant or an "equities of the case" analysis, several courts have held that § 502(j) creates an exception to the res judicata effect normally afforded an otherwise claims allowance procedure. *See In re Moffitt*, 408 B.R. 249, 255 (Bankr. E.D. Ark. 2009) (recognizing a § 502(j) exception to the preclusive effect of an allowed claim included in a plan confirmed pursuant to § 1327); *see also In re Gomez*, 250 B.R. 397, 399–400 (Bankr. M.D. Fla. 1999) ("[M]any courts have held that, under § 502(j) and Federal Rule of Bankruptcy Procedure 3008, a claim may be reconsidered at any time before the case is closed.").[3] Articulated best by the Bankruptcy Court for the Northern District of Georgia in *Bernard*, "a conclusion that res judicata bars reconsideration of allowance . . . would require one substantially to read section § 502(j) out

---

[3] The Court acknowledges that previous holdings in this district have held that, specifically in the Chapter 13 plan confirmation context, a party's attempt to relitigate the bifurcation of its claim pursuant to a confirmed Chapter 13 plan "is barred under the doctrine of res judicata." *In re Coffman*, 271 B.R. 492, 495–96 (Bankr. N.D. Tex. 2002) (Jones, J.). In this case, the Court is neither faced with the reclassification of a claim—as it was in *Coffman*—nor does this particular adversary proceeding arise under the Chapter 13 context. *See id.* at 497 (holding that prior case law permitting § 502(j) reconsideration post-confirmation did not pertain to the reclassification of a bifurcated claim pursuant to a confirmed plan). Accordingly, the Court does not find *Coffman* to be dispositive with respect to the res judicata issue in this case.

14

of the books." *In re Bernard*, 189 B.R. 1017, 1023 n.4 (Bankr. N.D. Ga. 1996). Moreover, applying res judicata to reconsideration of an allowed claim overlooks the fact that, mechanically, a claim may only be reconsidered "after some decision has been reached." *Id*. Thus, a claim for reconsideration would inherently seek to "change the very decision which would otherwise become res judicata." *Id*.

Moreover, the bankruptcy court's discretion in deciding whether to reconsider a claim is "**virtually plenary**." In re Colley, 814 F.2d 1008, 1010 (5th Cir. 1987) (citing the Advisory Committee's Note to Bankruptcy Rule 3008). Therefore, it is particularly troubling for the Court to simultaneously hold that (1) bankruptcy courts are afforded expansive discretion to determine reconsideration of a claim pursuant to § 502(j), and (2) such discretion is somehow inherently limited by res judicata.

The analytical awkwardness for the Court in this case stems from the fact that reconsideration is not being sought in a stand-alone motion but is instead being raised as a cause of action via Count IV in the Complaint:

> Additionally, the Trustee seeks to disallow *any* Claim the Defendant may have against the Debtor or the Estate. This, of course, includes Claim No. 10-1 filed by the Defendant in the underlying bankruptcy case, which must be disallowed based upon the facts and information subsequently made available to the Agent, as detailed herein. *See* 11 U.S.C. §§ 502(d) (disallowance until Transfers returned) and 502(j) (disallowance for cause).

ECF No. 34 at 3 (emphasis in original).

In asking the Court to find that res judicata applies in this case, and particularly in the Rule 12(b)(6) context, EastBanc has effectively asked the Court to determine that, on the face of the Complaint, it is "beyond doubt" that the Trustee can prove any set of facts that would entitle her to relief pursuant to § 502(j). In other words, the Trustee has no plausible avenue with which to plead that the equities of the case support, or that cause otherwise exists for, reconsideration under

§ 502(j). EastBanc's approach essentially turns the shield of an affirmative defense into a weapon, and places the onus on the Trustee to disprove the existence of an affirmative defense that, procedurally speaking, does not typically apply in the manner it is being deployed in.

The Court is by no means granting reconsideration today.  That requires a factual showing by the Trustee establishing the equities of the case or cause under Bankruptcy Rule 9024. *See* Fed. R. Bankr. P. 9024(a) (stating that Rule 60(b) applies in a bankruptcy case); *see also* Fed. R. Civ. P. 60(b) (enumerating six grounds for relief from a final judgment or order). Analyzing these issues under a 12(b) microscope is inappropriate in the context of claims allowance/disallowance given the inherent conflict between the application of claims preclusion at the pleading stage and statutory authority for reconsideration in this context.

Rather, the Court is only recognizing that, given the complexities of the underlying involuntary bankruptcy, the peculiarities of the Trustee's Complaint, and the particular role of a Chapter 7 trustee in the claims allowance process, it is not practical to apply res judicata under these circumstances and hold that it is "beyond doubt" that the Trustee is barred from relief as set forth in the Complaint.

### B.  Counts I & II: Avoidance under § 548 and TUFTA

In the Motion to Dismiss, EastBanc's core argument with respect to Counts I and II is that the Trustee "does not make allegations sufficient to support a reasonable inference that EastBanc provided the Debtor with less than reasonably equivalent value, much less no value," pursuant to the MSA and SOWs. ECF No. 36 at 20. Rather than dispute whether the Trustee plausibly pleaded insolvency and/or financial vulnerability under Counts I and II, EastBanc instead focuses entirely on what it perceives to be a "conclusory allegation" that Animo did not receive reasonably equivalent value in exchange for the approximately $2.6 million transferred to EastBanc. *Id*. The

Defendant contends that not only is it "incredible" for the Trustee to assert that the seven months of alleged services performed by EastBanc do not constitute reasonably equivalent value to the Debtor, but that the Trustee has not provided any allegations of same beyond a "one-sentence, conclusory allegation" that the EastBanc Software was "useless." *Id*. Instead, EastBanc argues that the Trustee is attempting to diminish the benefit of the bargain received by Animo retroactively by evaluating the transfers in "hindsight" after GloriFi's failure to launch. *Id*. at 21.

The Trustee contends that EastBanc's argument is an attempt to "reframe the value the Debtor allegedly received" by focusing on the value of the **services** performed by EastBanc rather than focus on the **software** itself, which the Trustee alleges was virtually "unusable" throughout the parties' working relationship. ECF No. 39 at 16. EastBanc's position, according to the Trustee, ignores the "true nature of what EastBanc was hired to deliver." *Id*. The Trustee further argues that, regardless of the merits of EastBanc's arguments, this dispute ultimately depends upon "fact issues to be determined at trial" rather than disposed of the motion to dismiss stage. *Id*.

The parties' dispute is both a matter of contract interpretation, as well as a battle over the defined deliverables of the MSA. EastBanc contends the underlying contracts are service-based, and therefore the Trustee's allegations do not plausibly allege a lack of reasonably equivalent value as to those services. Conversely, the Trustee focuses on the EastBanc Software that the Defendant was contracted to develop and deliver, and argues the Complaint plausibly establishes that the goods transferred from EastBanc to Animo were valueless at every point in time when Animo transferred funds in exchange for the goods.

The Court notes that neither the MSA nor the SOWs were attached to the Complaint. "In considering a motion to dismiss for failure to state a claim, a district court must [generally] limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley*

*Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing Fed. R. Civ. P. 12(b)(6)). However, the Fifth Circuit has expressly held that "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if [1] they are referred to in the plaintiff's complaint, and [2] are central to her claim." *Collins*, 224 F.3d at 498–99 (citation omitted) (internal quotations omitted). Here, the Complaint not only contains numerous explicit references to the contracts at issue, but the nature and scope of the contracts are central to determining the merits of the Trustee's avoidance claims and establishing the element of reasonably equivalent value.

Accordingly, a review of the MSA and SOWs is necessary for purposes of determining whether the agreements can be plausibly interpreted the goods-based contracts so as to support the Trustee's allegations. The Court's reasoning here is rather simple: if the sole focus in the Complaint is on the lack of value of the goods exchanged, but the MSA and SOWs do not plausibly establish contracts for goods, then the Complaint does not contain sufficient allegations to support the underlying cause of action. Alternatively, if a review of the MSA and SOWs establishes that the contracts are at least plausibly goods-based contracts, then the Trustee has, in turn, **plausibly** alleged that there is a lack of reasonably equivalent value derived from those goods. Although a definitive determination as to the nature of the underlying contracts is not necessary or appropriate at this stage, the dispositive question remains whether the MSA and SOWs can at least plausibly support the Trustee's cause of action for purposes of Rule 12(b)(6).

The Court is guided in this determination by general principles of contract interpretation, as applied under Texas law or District of Columbia law, as well as the MSA and SOWs themselves. As noted by numerous courts applying Texas contract law, "When a contract contains a mix of sales and services, the UCC applies if the sale of goods is the 'dominant factor' or 'essence' of the transaction." *MCR Oil Tools, LLC v. DMG Mori USA, Inc.*, Civ. Action No. 4:20-cv-00560-O,

2020 WL 13133311, at *3 (N.D. Tex. Sept. 15, 2020). Although whether the MSA and SOWs are governed by the Texas Uniform Commercial Code ("**UCC**") or common law is not an issue before the Court, the underlying analysis involved in evaluating "hybrid contracts" is of moment in this case. *Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 902 (5th Cir. 2004). [4]

The considerations courts typically use to determine the "essence" of a contract are seemingly non-exhaustive, including: (1) the nature of the goods at issue; (2) whether the purchase or sale of goods under the contract was incidental in comparison to the rendition of services; (3) whether any materials delivered are to be further incorporated or constructed by a third-party later on; and (4) any contractual language that helps illuminate the scope or breadth of the services provided in relation to the goods produced. *Propulsion*, 369 F.3d at 902–04; *see also Structural Metals, Inc. v. S& C Elec. Co.*, Civ. Action No. SA-09-CV-984-XR, 2012 WL 4959465, at *8 (W.D. Tex. Oct. 16, 2012) (noting that a key focus in the dominant factor analysis is "what the seller is providing"). Likewise, courts applying District of Columbia law also note that it may be telling whether the gravamen of a plaintiff's complaint "centers on an unsatisfactory service performance or, instead, the furnishing of deficient goods." *Z-Modular*, 729 F. Supp.3d at 9 (quoting *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir. 1983)) (internal quotations omitted).

---

[4] The Court notes that Section 7.7 of the MSA states that the agreement "will be governed by the law of the District of Columbia" including any dispute, claim, or controversy with respect to the interpretation of the MSA. ECF No. 36-1 at 7. The parties have not raised an issue as to which law applies. However, under District of Columbia law, the test for establishing the "predominant purpose" of a contract is strikingly similar to the "dominant factor" test under Texas law. *See* D.C. Code § 28:2-102(b) (1963) (noting that, in the case of a hybrid transaction, the UCC applies with a different scope depending on whether the "sale-of-goods" aspects of the transaction "predominate"); *see also Z-Modular, LLC v. MCN Build, Inc.*, 729 F. Supp.3d 1, 9 (D.D.C. 2024) (noting, in relation to a contract dispute under § 28:2-102, that the factors used for determining the predominant purpose of a contract include the language of the contract, the nature of the supplier's business, and the intrinsic worth of the materials involved). Accordingly, the Court will consider both Texas and District of Columbia law.

EastBanc argues that the "essence" of both the MSA and SOWs is service-oriented. The first page of the MSA provides for "Services" to be completed by EastBanc on behalf of Animo, which are therein defined as "professional services deliverables, and work product . . . set out in one or more [SOWs]." ECF No. 36-1 at 2. The MSA further states that the period of performance under the agreement is for an initial term of two years, with an automatic renewal of additional one-year periods until terminated by one of the parties. *Id*. Likewise, the effective date of the MSA—on or around November 2021—indicates that the parties contracted for EastBanc's "Services" to continue at least until late 2023—over a year after the alleged launch date for GloriFi's website and app. *Id*.

Furthermore, as exemplified in SOW1, the "Description of Services" agreed to by the parties includes, but is not limited to, project and product management, business analysis, solution architecture and technical design, and quality assurance testing. *See id*. at 10–11. Finally, all of the SOWs contain hourly rates and price estimates related to EastBanc personnel and their respective responsibilities, much of which is related to services such as "software design" or "code documentation." *Id*. at 21–14. Each of these characteristics arguably points to the underlying contracts being predominantly service-oriented, contrary to the Trustee's position.

Nevertheless, the Court finds numerous provisions within the contracts that **plausibly** establish that the dominant factor of both the MSA and SOWs is the functionality of the EastBanc Software rather than strictly the development of same. For example, while the MSA provides for a definition of services, the Court cannot overlook that EastBanc was contractually obligated to provide Animo with "deliverables", as identified in the SOWs. *Id*. at 2. Likewise, while the MSA contemplates a two-year contractual period, the SOWs provide for narrower timetables with defined milestones/deliverables. For example, in SOW1, EastBanc was to provide GloriFi's

Minimal Viable Product (MVP) code by February 28, 2022. *Id*. at 10. Like a contractor of tangible property, EastBanc provided the enumerated services on a "time and materials basis." *Id*. Furthermore, despite the litany of above-mentioned services provided in the SOWs, the agreements included a provision for "Main Deliverables", which expressly noted that EastBanc would develop a "banking solution" and related products. *Id*. at 12–13. The explicit reference to deliverables is even more prominent in agreements like SOW2, which contains a separate "Deliverables" provision that identifies EastBanc's obligation with respect to the development of "[a]pproximately 40 API endpoints" and "[p]roxy API documentation." *Id*. at 17.

Perhaps more importantly, in Section 4.1 of the MSA, Animo, as the customer, "will be the owner of all right, title, and interest in and to the software and other deliverables prepared by or on behalf of EastBanc." *Id*. at 5. Likewise, in Section 4.2 of the MSA, the parties contracted as to the ownership of the intellectual property rights in the **products developed**. *Id*.

Although the Court recognizes the numerous references to EastBanc's services throughout the various agreements, the frequency with which deliverables are referenced and contracted for is sufficient enough for the Court to find that the primary purpose of the contracts is plausibly centered around goods rather than services. While the contracts at issue might not match the Fifth Circuit's finding in *Propulsion*—where every aspect of the contract pointed to the fact that it was for manufacture and delivery of a product—there are enough contractual terms and contextual clues in the agreements for the Court to hold that, for purposes of a Rule 12(b)(6) motion, the MSA and SOWs plausibly pertain to a similar manufacturing and delivery of products in the form of software.

Accordingly, the Court finds that it is therefore plausible based on the allegations in the Complaint that, at the time of the transfers to EastBanc, EastBanc did not provide Animo with

reasonably equivalent value via the EastBanc Software. Taking the Trustee's allegations as true, there is not a single instance in the Complaint where the EastBanc Software worked in any reasonable capacity. Rather, the Trustee alleges time and again that the EastBanc Software was always defective, plagued with delays from the very beginning, and inherently underdeveloped. At this stage, the Trustee has sufficiently pleaded claims for fraudulent transfer under both § 548 and TUFTA.

Therefore, the Court will DENY the Motion to Dismiss with respect to Counts I and II.

### C. Count IV: Disallowance under § 502(j)

EastBanc's primary argument on Count IV is that the Trustee "did not assert a single ground for reconsideration and made absolutely no attempt to show cause exists for the relief requested," which therefore requires the Court to grant the Motion to Dismiss with respect to Count IV. ECF No. 36 at 24. As previously stated, section 502(j) provides bankruptcy courts with the "power to reconsider the allowance or disallowance of proofs of claim 'for cause.'" *Colley*, 814 F.2d at 1010 (quoting 11 U.S.C. § 502(j)). Additionally, § 502(j) provides that, "A reconsidered claim may be allowed or disallowed according to the equities of the case." 11 U.S.C. § 502(j). Bankruptcy courts have noted, however, that "cause" is not "explicitly defined in the [Bankruptcy Code] or in the [Bankruptcy] Rules, and there is some disagreement among the courts as to its meaning." *In re Willoughby*, 324 B.R. 66, 72 (Bankr. S.D. Ind. 2005).

Despite its amorphous definition, this Court has previously made clear that the "for cause" standard is not "standardless," and that courts have consistently "likened the 'cause' standard found in section 502(j) with the substantive requirements of Bankruptcy Rule 9024 and Rule 60(b) of the Federal Rules of Civil Procedure." *Coffman*, 271 B.R. at 498. As articulated by the Honorable Robert T. Jones, courts have generally held that Bankruptcy Rule 9024, which expressly

incorporates Rule 60(b), "sets forth the standards for reconsideration of claims and helps define 'cause' under § 502(j)." *Id*.[5]

Given that Rule 60(b) provides useful parameters for how courts should evaluate whether a party has provided adequate "cause" under § 502(j), it is important to note the causes for relief from a judgment enumerated under Rule 60(b). The Rule provides six distinct grounds for relief: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, it is based on an earlier judgment that has been reversed or vacated, or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b)(1)–(6). Accordingly, a party that sufficiently pleads one of the enumerated causes under Rule 60(b) naturally satisfies the "cause" standard under § 502(j), and it is then up the court to determine whether the "equities of the case" require allowance or disallowance. In the Response, the Trustee argues that not only does the Complaint contain "ample allegations regarding EastBanc's failure to deliver on its promises and provide reasonably equivalent value to the Debtor," but that these allegations provide the very "foundation" for finding the necessary cause under § 502(j) to disallow the EastBanc Claim. ECF No. 39 at 27.

---

[5] EastBanc argues in the Motion to Dismiss that the Trustee was required to satisfy the Rule 60(b) standard, rather than solely providing "cause" pursuant to § 502(j). *See* ECF No. 36 at 23. This position is not completely unfounded, and the Court recognizes that there remains some confusion as to whether a proof of claim that is objected to constitutes a "contested matter" and therefore consideration of same requires a court to establish whether § 502(j) or Rule 60(b) is the applicable standard. *See e.g., Colley*, 814 F.2d at 1010 ("We interpret [Bankruptcy] Rule 9024 to provide that, when a proof of claim has in fact been litigated between parties . . . the litigants must seek reconsideration . . . pursuant to the usual Rule 60 standards . . . ."); *see also In re Smith*, 299 B.R. 687, 691 (Bankr. S.D. Ga. 2003) (holding that Rule 60(b) should only apply when a court enters an order allowing or disallowing a claim "subsequent to a challenge to that claim"). Here, given that decisions like *Coffman* do not bifurcate the two standards so strictly, the Court sees no need in establishing whether the Trustee was required to seek reconsideration solely under either § 502(j) or Rule 60(b) when pertinent case law shows that the latter standard informs the former.

The basis for reconsideration as a cause of action provided by the Trustee is unsatisfactory. Alluding to the allegations in the Complaint in a generalized manner and simply reciting the "equities of the case" standard does nothing to establish a basis for why the Court should reconsider its Claim Objection Order. While the Court may undoubtedly make inferences in favor of the Trustee and take her allegations as true at this stage in the case, it is not required to engage in mind-reading to uncover what "cause" the Trustee is asserting. Accordingly, the Court ultimately agrees with EastBanc that the Trustee has failed to state a claim with respect to her claim under § 502(j).

The Court will take a moment to reconcile the dismissal of Count IV and its previous ruling with respect to EastBanc's res judicata argument. To clarify, the Court does not find it is "beyond doubt" that the Claim Objection Order cannot be reconsidered pursuant to § 502(j). However, it also does not find that the Trustee's cause of action, as currently pleaded, plausibly articulates her entitlement to § 502(j) relief. Although such a distinction is undoubtedly narrow, the Court believes it to be essential. Given that Count IV is dismissed without prejudice to the right to replead (as provided below), the Court finds that (1) the Trustee is not precluded as a matter of law from seeking § 502(j) relief, but (2) the Trustee's **expression** of her entitlement to that relief is insufficient under Rule 12(b)(6).

Therefore, the Court will GRANT the Motion to Dismiss as to Count IV of the Complaint.

### D. Count V: Breach of Contract

Under Texas law, a breach of contract claim requires the plaintiff to prove: (1) the existence of a valid contract; (2) the plaintiff performed their duties under the contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of the defendant's breach.

*See e.g., Kim v. Nationwide Mut. Ins. Co.*, 614 F. Supp.3d 475, 492 (N.D. Tex. 2022).[6] This Court

noted in *Reagor-Dykes* that, "To survive a Rule 12(b)(6) motion to dismiss a breach of contract

claim, the plaintiff needs to allege "critical elements of a breach of contract claim: the existence

of a contract, a breach of a contract, and resulting damages." *In re Reagor-Dykes Motors, LP*, Case

No. 18-50214-RLJ-11, 2021 WL 1219537, at *12 (Bankr. N.D. Tex. Mar. 30, 2021) (Jones, J.).

Additionally, "the plaintiff needs to allege or show the contract or provision that the defendant

breached." *Id*. However, Judge Jones stated in *Reagor-Dykes*: "The purpose of a Rule 12(b)(6)

motion is to test the formal sufficiency of the plaintiff's complaint, and should not be used to

resolve factual issues or the merits of the case." *Id*. (citation omitted) (internal quotations omitted).

Although EastBanc provides eight enumerated reasons as to why the Trustee failed to

sufficiently plead her breach of contract claim under Count V, EastBanc's arguments all revolve

around the Trustee's purported inability to allege the second, third, and fourth elements of a breach

of contract. *See* ECF No. 36 at 24–25. Additionally, EastBanc argues that the Court should consider

the MSA and the SOWs as part of its determination because the contracts were referred to in the

Complaint and are central to the Trustee's claim. *Id*. at 25 n.9.

In the Response, the Trustee contends, as a threshold matter, that while cases like *Reagor-

Dykes* support the notion that a plaintiff can attach the contract to the complaint for consideration

by the court, *Reagor-Dykes* does not establish that a plaintiff is required to do so. ECF No. 39 at

28. The Trustee instead points to a myriad of allegations to underscore that she provides specific

---

[6] The Court notes, once again, that the MSA provides that the agreement "will be governed by the laws of the
District of Columbia, without regard to its conflicts of laws principles." ECF No. 36-1 at 7. The Court notes that the
elements for a breach of contract under District of Columbia law are also effectively the same as they are under
Texas law. *See Inst. of Multidimensional Med. v. Metagenics, Inc*., 635 F. Supp.3d 6, 13 (D.D.C. 2022) ("There are
four elements to a breach-of-contract claim in the District of Columbia: a party must establish (1) a valid contract
between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages
caused by breach.") (citation omitted) (internal quotations omitted).

examples of both the provisions breached by the Defendant as well as the harm suffered by Animo as a result of the alleged breaches. *Id*. at 28–29.

Before evaluating the merits of the parties' arguments, the Court must dispense with two threshold matters of its own. First, the Court disagrees with EastBanc that the Trustee has not adequately pleaded that Animo performed under the contracts. The Complaint is rife with examples of alleging that, upon receiving invoices from EastBanc, Animo transferred the requested funds pursuant to its contractual obligations. Second, the Court agrees with EastBanc that, much like Counts I and II, consideration of the MSA and the SOWs is essential to make a proper determination as to Count V. Accordingly, that leaves the Court with determining whether the Trustee sufficiently pleaded (1) breach and (2) damages.

However, the Court need not reach a determination on the Trustee's damages allegations, or the dispute with respect to the Limitation of Liability Clause, because the Trustee ultimately finds that the Trustee has not sufficiently pleaded the element of breach. At bottom, the Trustee's arguments with respect to breach fall into one of two categories: (1) failure to deliver; and (2) violation of its promise under SOW1 to place 25% of the total contract value to serve as "fees at risk" (the **Fees at Risk Provision**"). *See generally* ECF No. 34; *see also* ECF No. 36-1 at 15 ("EastBanc Technologies will place 25% of the total contract value to serve as fees-at-risk to ensure the team will deliver the work on or before the February 28th deadline."). The Trustee provides numerous allegations related to these purported breaches of contract throughout the Complaint. However, a review of the contracts at issue illustrates why the Trustee's allegations are effectively a mile wide and an inch deep in terms of connecting the allegations to the terms of the contracts.

A primary focus for the Trustee is the allegation that EastBanc failed to deliver the EastBanc Software by the respective deadlines under all "*all four* SOWs." ECF No. 34 at 10

(emphasis in original). Yet there are several components to the underlying agreements that undercut the Trustee's premise. First, although all of the SOWs provide for targeted dates of completion, these provisions do not establish an affirmative end date to the extent alleged by the Trustee. For example, while the terms in SOW1 contemplate a project completion by February 28, 2022, that timeline is only subject to an "[e]stimated project duration" that expressly remains in effect "until terminated or expired under the MSA"—an agreement that the Court previously noted had a period of performance from November 2021 to November 2023 at least. ECF No. 36-1 at 12.

Second, SOW4, specifically, is even more equivocal in terms of a completion date, as it expressly includes language that EastBanc "will try to deliver by May 1st, 2022" while still providing for a project duration of January to August 2022. *Id*. at 30. Finally, EastBanc accurately notes that, despite the Trustee's claim that EastBanc failed to deliver working versions of the EastBanc Software by April 2022, both the potential delivery window and the project timeline in SOW4 were never estimated to reach completion by that early of a date in the first place. *Compare* ECF No. 34 at 10, *with* ECF No. 36-1 at 30.

The Trustee's argument with respect to the alleged violation of the Fees at Risk Provision contains equally troubling deficiencies from a pleading standpoint. First, EastBanc once again accurately notes that the Fees at Risk Provision is only contained in SOW1, despite the fact that the Trustee does not delineate this alleged breach of SOW1 from the three other SOWs that do not contain such a provision. *See* ECF No. 36-2 at 15 ("EastBanc Technologies will place 25% of the total contract value to serve as fees-at-risk to ensure the team will deliver the work on or before the February 28th deadline."). While the allegations with respect to the Fees at Risk Provision would easily meet the notice pleading requirements under Rule 8 for breach of contract of SOW1,

specifically, the Trustee's attempt to utilize this provision in relation to a breach of both the MSA and all four SOWs, without additional allegations, is insufficiently vague.

Likewise, given the limited applicability of the Fees at Risk Provision in relation to the allegations in the Complaint, the Court once again agrees with EastBanc that while the Trustee alleges that EastBanc "missed its deadlines for the deliverables set forth in all four SOWs," the Complaint does not contain any specific allegation as to EastBanc's failure to deliver the software detailed in SOW1. ECF No. 29 at 10. Rather, the Complaint contains allegations of a promise to deliver the software in SOW1 by February 28, 2022, as well as the existence of the Fees at Risk Provision that would trigger if the Defendant failed to deliver by that date, but without any concrete allegation that EastBanc missed its February 28th deadline. Accordingly, even if the Court were to consider whether the Trustee adequately pleaded a breach of the Fees at Risk Provision strictly as to SOW1, the Complaint does not plausibly allege a breach of that particular agreement whatsoever.

Nothing in the Court's determination requires the Trustee to meet heightened pleading requirements to allege a breach of contract under the agreements. However, as articulated in *Reagor-Dykes*, the Trustee still must allege which contract provision was breached and how the Defendant breached same. Here, the Trustee provides no specificity as to how the alleged breaches by EastBanc connect to the MSA and the SOWs, or how, if the Fees at Risk Provision is only in SOW1, EastBanc could have plausibly breached the other contracts pursuant to a provision that is not related thereto.

Therefore, the Court will GRANT EastBanc's Motion to Dismiss with respect to Count V.

### E.  The Trustee's Motion for Leave to Amend under Rule 15

Alternatively, the Trustee has requested leave to amend under Rule 15(a)(2) if she has failed to sufficiently plead any element or cause of action. *See* ECF No. 39 at 29. Rule 15 provides that parties should be granted leave to amend "freely" when justice so requires. Fed. R. Civ. P. 15(a)(2). This principle "supports the general policy of the Federal Rules that litigation should test the merits of claims, not the technical skill of pleadings." *In re Elcoteq, Inc.*, 521 B.R. 189, 203 (Bankr. N.D. Tex. 2014) (Houser, J.). The Fifth Circuit has made clear that "Rule 15(a) 'evinces a bias in favor of granting leave to amend.'" *Smith v. EMC Corp.*, 393 F.3d 590, 598 (5th Cir. 2004) (citation omitted). A court's discretion to deny has been consistently defined as "misleading." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004). Courts should grant leave to amend "absent a 'substantial reason' such as undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or undue prejudice to the opposing party." *Id.*

There is no substantial reason to deny the Trustee's leave to amend. In light of the procedural history of the case and given that the parties are still at the pleadings stage of litigation, there is no indication that EastBanc would be subjected to undue delay. EastBanc has also not raised any notion of bad faith or a dilatory motive on behalf of the Trustee, and has only generally requested the Trustee's request be denied, given the prior amendment. *See* ECF No. 43 at 9. Should the Trustee seek to amend her Complaint, the Trustee's Motion to Amend is hereby GRANTED.

## VI.    CONCLUSION

For the reasons set forth above, it is hereby

**ORDERED** that the Defendant's Motion to Dismiss is GRANTED IN PART with respect to Counts IV and V of the Complaint without prejudice; it is further

**ORDERED** that the Motion to Dismiss is DENIED IN PART with respect to Counts I, II, III, and VI of the Complaint; and it is further

**ORDERED** that the Court will GRANT the Trustee's Alternative Motion for Leave to Amend pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Any amended complaint must be filed within forty-five (45) days of entry of this Order.

### ### END OF ORDER ###